# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| NNN SIENA OFFICE PARK I 2, LLC, et al.,<br><br>              Plaintiffs – Appellants,<br><br>v.<br><br>WACHOVIA BANK, N.A., now known as Wells Fargo Bank, National Association, successor by merger; and HOLLAND & HART, LLP<br><br>              Defendants – Appellees. | Nos. 14-16991, 14-16993<br><br>DC No. 2:12-cv-01524-MMD-PAL<br><br>District of Nevada, Las Vegas |

## APPELLANTS' OPENING BRIEF

_____

Bart K. Larsen (S.B.N. 008538)
KOLESAR & LEATHAM
400 South Rampart Blvd., Suite 400
Las Vegas, NV 89145
Telephone: (702) 362-7800
Facsimile: (702) 362-9472
Email: blarsen@klnevada.com

Counsel for Plaintiffs-Appellants

Appellants NNN SIENA OFFICE PARK I 2, LLC, NNN SIENA OFFICE PARK I 3, LLC, NNN SIENA OFFICE PARK I 4, LLC, NNN SIENA OFFICE PARK I 5, LLC, NNN SIENA OFFICE PARK I 7, LLC, NNN SIENA OFFICE PARK I 8, LLC, NNN SIENA OFFICE PARK I 10, LLC, NNN SIENA OFFICE PARK I 12, LLC, NNN SIENA OFFICE PARK I 13, LLC, NNN SIENA OFFICE PARK I 17, LLC, NNN SIENA OFFICE PARK I 20, LLC, NNN SIENA OFFICE PARK I 21, LLC, NNN SIENA OFFICE PARK I 22, LLC, NNN SIENA OFFICE PARK I 24, LLC, NNN SIENA OFFICE PARK I 25, LLC, NNN SIENA OFFICE PARK I 26, LLC, NNN SIENA OFFICE PARK I 27, LLC, NNN SIENA OFFICE PARK I 28, LLC, NNN SIENA OFFICE PARK I 29, LLC, NNN SIENA OFFICE PARK I 31, LLC, NNN SIENA OFFICE PARK I 32, LLC, NNN SIENA OFFICE PARK I 33, LLC, NNN SIENA OFFICE PARK I 34, LLC, NNN SIENA OFFICE PARK I 35, LLC, NNN SIENA OFFICE PARK I 36, LLC, NNN SIENA OFFICE PARK I 37, LLC, NNN SIENA OFFICE PARK I 38, LLC, NNN SIENA OFFICE PARK I 39, LLC, NNN SIENA OFFICE PARK I 40, LLC, and NNN SIENA OFFICE PARK I 41, LLC (collectively, "Appellants" or "TICs") hereby submit their Opening Brief in these consolidated appeals.

# TABLE OF CONTENTS

I. Statement of Jurisdiction     1

II. Statement of the Issues     1

III. Statement of the Case     2

IV. Procedural History     11

V. Summary of Appellants' Arguments     11

    A. Appellants' Claims against Wachovia Are Not Barred by the Statute of Limitations.     11

    B. Holland & Hart Did Not Have Actual Authority to Act for Appellants.     12

    C. Holland & Hart Failed to Represent Appellants' Interests.     13

VI. Standard of Review     13

VII. Arguments     14

    A. The District Court Erred in Determining that Appellants' Claims against Wachovia are Barred by the Statute of Limitations.     14

       1. Determining When a Duty to Investigate Arises Is a Question of Fact that Is Rarely Appropriate for Resolution as a Matter of Law.     15

       2. The November 19, 2008 Quarterly Report Did Not Place Appellants on Inquiry Notice of Potential Claims against Wachovia.     15

       3. The Statute of Limitations on Appellants Claims against Wachovia Did Not Begin to Run Until Appellants Had     18

Reason to Suspect Wachovia Was Culpable.

    4. GERI's Attempts to Conceal of the Nature of the     19
       Receiver's Claims Tolled the Running of the Statute of
       Limitations.

B. The District Court Erred in Finding that Holland & Hart    22
   Acted with Implied Actual Authority

    1. Actual Authority, Whether Express or Implied, Requires    22
       a Manifestation of Asset.

    2. GERI Had No Actual Authority to Engage Holland &    24
       Hart to Act for Appellants.

    3. Holland & Hart Cannot Rely on Communications with    26
       GERI to Establish that It Acted with Actual Authority.

    4. Appellants Did Not Ratify Holland & Hart's    27
       Unauthorized Actions.

C. Holland & Hart Failed to Faithfully Represent Appellants'    28
   Interests

VIII. Conclusion    30

Corporate Disclosure    32

Statement of Related Cases    33

Certificate of Service    34

Certificate of Compliance    35

# I. STATEMENT OF JURISDICTION

Appellants filed their Complaint in the Eighth Judicial District Court in Clark County, Nevada on July 20, 2012. Defendant Wachovia Bank, N.A. ("Wachovia") later removed the action to the United States District Court for the District of Nevada pursuant 28 U.S.C. § 1441(a) on the basis of diversity jurisdiction arising under 28 U.S.C. § 1332.

On September 8, 2014, the District Court entered separate orders (EOR 15-25, 26-38) granting motions for summary judgment filed by Defendants Wachovia and Holland & Hart, LLP ("Holland & Hart") and, thereafter, entered final judgments (1 EOR 13, 14) in favor of Wachovia and Holland & Hart disposing of all parties' claims. This Court has jurisdiction over these consolidated appeals pursuant to 28 U.S.C. § 1291. Appellants filed timely notices of appeal as to both judgments on October 8, 2014. This Court sua sponte consolidated these appeals on October 21, 2014.

# II. STATEMENT OF THE ISSUES

1. Did the District Court err in finding, as a matter of law, that the statute of limitations applicable to Appellants' claims against Wachovia for (a) aiding and abetting fraud and (b) aiding and abetting securities fraud began to run no later than November 19, 2008 despite the fact that vital information was intentionally

concealed from Appellants, which prevented Appellants from actually discovering the basis for their claims against Wachovia until late 2011 when they were finally granted access to documents identifying Wachovia as a culpable party?

      2.    Did the District Court err in finding, as a matter of law, that Holland & Hart acted with implied, actual authority in representing Appellants' interests even though Holland & Hart was engaged to act on Appellants' behalf by GERI, which had neither actual nor apparent authority to do so and had intentionally misled Appellants as to the nature of Holland & Hart's engagement to conceal its own wrongful conduct?

      3.    Did the District Court err in finding, as a matter of law, that no conflict of interest existed in Holland & Hart's joint representation of Appellants and GERI when it was the wrongful conduct of GERI and its affiliates that gave rise to the Receiver's claims against Appellants' property?

## III.   STATEMENT OF THE CASE

Appellants each own varying, undivided tenant-in-common ("TIC") interests in two adjacent commercial buildings located in the Siena Office Park in Henderson, Nevada (the "Property").  In January 2007, the original developers of the Property entered into an option contract (the "Option Contract") granting R.O.C.S.E.V. Capital, LLC ("ROCSEV") the right to purchase the Property at a set

price for a limited period of time. ROCSEV was managed by Vescor Preferred Equity, LLC ("Vescor") and controlled by Val E. Southwick ("Southwick"), who would later plead guilty to operating a Ponzi scheme (the "Vescor Ponzi Scheme"). 3 EOR 383-405. For his crimes, Southwick was eventually sentenced to serve nine consecutive 1-to-15 year prison terms, the maximum allowed by Utah law. 3 EOR 406-410.

On or about April 3, 2007, ROCSEV entered into a purchase and sale agreement (the "PSA") under which it agreed to purchase the Property pursuant to the Option Contract and to then immediately resell the Property to Triple Net Properties, LLC ("Triple Net Properties") for $35,775,000 (the "Purchase Price"). 3 EOR 327-382. Triple Net Properties was a wholly owned subsidiary of NNN Realty Advisors, Inc. (Triple Net Properties and NNN Realty Advisors, Inc. are hereinafter collectively referenced as "Triple Net Properties"), which held itself out to be an expert in creating, marketing, and managing securitized TIC and other complex real property investment vehicles. 2 EOR 181-326. As part of the PSA, ROCSEV and Triple Net Properties agreed that $3,023,306 of the Purchase Price otherwise payable to ROCSEV (the "Holdback Funds") would be held in an escrow account after closing to pay anticipated shortfalls in rental receipts from certain leases in place at the Property (the "Holdback Agreement"). 3 EOR 360-

369.  By the time the PSA was signed, the Vescor Ponzi Scheme had begun to unravel.  The PSA identified four lawsuits that had been filed against Southwick in Clark County, Nevada pursuant to which notices of *lis pendens* had already been recorded against the Property.[1]  At least 11 additional cases not identified in "Exhibit D" to the PSA were also then pending against Southwick and his affiliates in Clark County, Nevada.[2]  At least two more cases had also been filed against Southwick and various related entities in Utah, where most of the investors in the Vescor Ponzi Scheme were located.[3]  Undaunted, Triple Net Properties pushed forward toward its acquisition and resale of the Property to Appellants even as new complaints continued to be filed against Southwick in early 2007[4] and new notices of *lis pendens*[5] continued to be recorded against the Property.  Despite these obvious red flags, Triple Net Properties shamelessly pressed forward.

Triple Net Properties disseminated of a Private Placement Memorandum dated April 6, 2007 (the "PPM") that was used to market the sale of TIC interests

---

[1] These four cases are identified in "Exhibit D" to the PSA.  3 EOR 370.

[2] Eighth Judicial District Cases Nos. A491371, A526609, A529536, A529799, A 531146, A531245, A531477, A532787, A536707, A537121, and A538347.

[3] U.S. District Court for the District of Utah, Cases Nos. 2:06-cv-00737 and 2:06-cv-00742.

[4] Eighth Judicial Court Cases Nos. A540162, A543927, and A551871.

[5] Clark County, Nevada Official Records Book/Document Nos. 20070430-0003842, 20070430-0003844, 20070430-0003847, and 20070511-0004976.

in the Property (the "Siena Investment") to Appellants and others. 2 EOR 181-326. The PPM did not include copies of the PSA or the Holdback Agreement. Similarly, the PPM made no reference whatsoever to ROCSEV, Southwick, Vescor, the Vescor Ponzi Scheme, or the increasing number of lawsuits being filed against Southwick and his affiliates. The PPM briefly mentioned that four *lis pendens* had been recorded against the Property but downplayed the risk posed by the pending litigation, stating that all *lis pendens* must be released as a condition to closing and that releases for the *lis pendens* had already been provided to the escrow agent. 2 EOR 199. As additional lawsuits against Southwick continued to surface, Triple Net Properties negotiated an Amended and Restated Holdback Agreement (the "Amended Holdback Agreement") with ROCSEV that provided for the first $300,000 (the "Litigation Funds") in interest accruing upon the Holdback Funds to be set aside to pay future litigation costs. 5 EOR 887-892.

Triple Net Properties later assigned its rights under the PSA to NNN Siena Office Park I, LLC (the "Sponsor"), which was organized by Triple Net Properties for the purposes of purchasing the Property and serving as a conduit for soliciting investments in the Property from Appellants. On June 4, 2007, the Sponsor and an

initial group consisting of 15 Appellants[6] purchased varying TIC interests in the Property.  On June 18, 2007, Triple Net Properties produced a Third Supplement to the PPM in which it stated that the *lis pendens* against the Property had been released.  5 EOR 909-913.  The Sponsor then continued to sell portions of its TIC interest in the Property to seven addition Appellants[7] on June 27, 2007 (the "June 27, 2007 Closing Group") and to eight additional Appellants[8] on July 26, 2007 (the "July 26, 2007 Closing Group").  The purchase of the Property was financed through a $28,620,000 loan (the "Loan") made by Wachovia.  Additionally, the Sponsor collected $13,350,000 in equity contributions from Appellants through the sale of TIC interests in the Property.  The resulting structure of the Siena Investment created a total purchase price for Appellant's TIC interests in the Property of $41,970,000, which was $6,195,000 higher than the actual Purchase Price of $35,775,000 and $5,470,000 higher than the appraised value of the Property of $36,500,000.  2 EOR 182-184.

As part of the Siena Investment, Appellants were also required to enter into a management agreement (the "Management Agreement") under which another subsidiary of Triple Net Properties, Triple Net Properties Realty, Inc. ("Triple Net

---

[6] TICs 2, 3, 4, 5, 7, 8, 10, 12, 17, 20, 21, 22, 24, and 25.  2 EOR 136.
[7] TICs 26, 27, 28, 29, 30, 31, 32, and 33.  2 EOR 136-137.
[8] TICs 34, 35, 36, 37, 38, 40, and 41. 2 EOR 137.

Realty") was appointed as the property manager for the Property. 3 EOR 557-588.

In December 2007, Triple Net Properties merged with Grubb & Ellis Company and

continued doing business under the Grubb & Ellis name. As part of this merger,

Triple Net Realty was renamed Grubb & Ellis Realty Investors, LLC ("GERI") but

otherwise continued to act as the manager for the Property under the Management

Agreement. 3 EOR 411-420.

On February 6, 2008, the United States Securities and Exchange

Commission (the "SEC") filed suit against Southwick and several entities involved

in the Vescor Ponzi Scheme in the United State District Court for the District of

Utah alleging various securities law violations (the "SEC Action"). 3 EOR 421-

438. On or about May 5, 2008, the United State District Court for the District of

Utah appointed Robert G. Wing, as receiver for the entities involved in the Vescor

Ponzi Scheme (the "Receiver"), and empowered him to recover the proceeds of the

Vescor Ponzi Scheme. 3 EOR 439-447.

The Receiver eventually began an investigation of the Siena Investment and

on June 9, 2008 contacted GERI to make a claim against the Holdback Funds. 4

EOR 756-758. GERI, without consulting Appellants, then engaged Holland &

Hart in July 2008 to respond to the Receiver's claims. Notwithstanding the fact

that the Receiver's claim to the the Holdback Funds was directed to GERI as a

successor to Triple Net Properties, GERI used operating funds from the Property, which rightfully belonged to Appellants, to pay the attorney fees charged by Holland & Hart in connection with the Receiver's investigation. 2 EOR 139-145.

On July 6, 2009 the Receiver filed a complaint against GERI as a successor in interest to Triple Net Properties (the "Receiver Action") alleging that the purchase of the Property in 2007 was part of the Vescor Ponzi Scheme. 5 EOR 1080-1089. The Receiver also alleged that GERI had breached its obligations under the Amended Holdback Agreement. 5 EOR 1088-1089. Without making any effort to communicate with Appellants or to obtain Appellants' approval, GERI and Holland & Hart agreed to expand the scope of Holland & Hart's engagement to include the defense of the Receiver action. 4 EOR 870-873. Holland & Hart then filed a motion to intervene seeking to make Appellants parties to the Receiver Action. 5 EOR 1090-1094. In a quarterly report dated August 25, 2009, GERI provided an incomplete and misleading description of the Receiver Action to Appellants that strongly implied that they had been sued by the Receiver alongside GERI. 3 EOR 461. GERI never disclosed that it was the sole target of the Receiver's complaint, the filing of the motion to intervene, or that it had knowledge of the Property's connection to the Vescor Ponzi Scheme prior to the acquisition of the Property in 2007. Instead, GERI continued to provide the same

incomplete and misleading information to Appellants in several subsequent quarterly reports and conference calls in which GERI consistently downplayed the significance of the Receiver Action and assured Appellants that the matter would be resolved favorably. 3 EOR 465, 468-469, 471.

In early 2010, a group of Appellants that included TICS 7, 8, 10, 20, 25, 35, 36, 37, 38, 39, and 41 (the "Minority TICs") began to suspect that GERI's reports concerning the Receiver Action were inaccurate and began their own investigation through which they discovered the true nature of the Receiver's claims against GERI and that they had become parties to the Receiver Action through the filing of the motion to intervene. 3 EOR 525-527. The Minority TICs engaged the law firms of Hanson Bridgett, LLP and Ray Quinney & Nebeker P.C., as local counsel, to represent them in the Receiver Action in place of Holland & Hart. 4 EOR 825-831. The Minority TICs promptly asserted cross claims against GERI in the Receiver Action for indemnity based upon the role of GERI and its affiliates in the marketing and sale of TIC interests in the Property to Appellants. 3 EOR 473-500.

Almost immediately, a dispute arose when the Minority TICs requested that Holland & Hart transfer their client files to their new counsel. 4 EOR 794-795, 3 EOR 527. After several months of additional litigation, Holland & Hart was ordered to release the contested files to the Minority TICs on September 29, 2011.

3 EOR 501-506.  Upon reviewing the GERI files received from Holland & Hart in late 2011, the Minority TICs finally discovered the full extent to which they had been defrauded and learned for the first time that Wachovia knew of the litigation related to the Vescor Ponzi Scheme prior to closing and of the substantial likelihood that future litigation would be brought against the Property but chose to make no disclosure of that information to Appellants as it financed the purchase of their TIC interests in the Property.  5 EOR 1112-1114.  This nondisclosure by Wachovia made it possible for GERI and its affiliates to conceal adverse information from Appellants as it solicited them to purchase TIC interests in the Property.

By early 2012, Appellants had spent well over $1 million in attorney fees and costs in battling the Receiver and GERI, which had largely exhausted Appellants' resources and had left them with little choice but to settle with the Receiver.  2 EOR 143-144, 3 EOR 507-516.  Once they were free from the Receiver Action and finally understood the full measure of the fraud committed against them in connection with the purchase and financing of the Property, Appellants promptly filed the underlying action against Wachovia and Holland & Hart on July 20, 2012.  3 EOR 535-556.

## IV. PROCEDURAL HISTORY

As the parties were completing discovery, Wachovia filed its motion for summary judgment on September 9, 2013. Appellants filed their opposition to Wachovia's motion for summary judgment on October 25, 2013. Wachovia filed its reply on November 25, 2013. Shortly after discovery was completed, Holland & Hart filed its motion for summary judgment on November 25, 2013. Appellants filed their opposition to Holland & Hart's motion for summary judgment on December 27, 2013. Holland & Hart filed its reply on January 13, 2014.

The district court set oral argument on both Wachovia and Holland & Hart's motions for summary judgment for August 28, 2014. On September 8, 2014, the District Court entered separate orders granting both Wachovia and Holland & Hart's motions and, thereafter, entered final judgments in favor of Wachovia and Holland & Hart disposing of all claims at issue.

## V. SUMMARY OF APPELLANTS' ARGUMENTS

### A. Appellants' Claims against Wachovia Are Not Barred by the Statute of Limitations.

The disclosure by GERI on November 19, 2008 that the seller of the Property was affiliated with Southwick and that, as a result of that affiliation, the Holdback Funds had been "temporarily" frozen did not constitute sufficient notice of potential claims against Wachovia to trigger the running of the statute of

limitations. Under Nevada law, the statute of limitations for such claims does not begin to run until the victimized party knows to a reasonable probability of facts support all elements of the claim. Neither the November 19, 2008 disclosure by GERI nor any prior disclosure provided sufficient information to put Appellants on notice of potential claims against Wachovia. It was only after Holland & Hart was ordered to release GERI's files regarding the acquisition of the Property to the Minority TICs on September 29, 2011 that Appellants finally had access to information indicating Wachovia was complicit in the fraud that took place.

**B.  Holland & Hart Did Not Have Actual Authority to Act for Appellants.**

In order for Holland & Hart to prove that it acted with actual authority to represent Appellants' interests, it must demonstrate that, at the time it undertook the representation, it reasonably believed based upon Appellants' statements or conduct that it was acting in accordance with Appellants' wishes. Holland & Hart admits that it had no communication with Appellants until after filing the motion to intervene through which it made Appellants parties to the Receiver Action. Consequently, it is impossible for Holland & Hart to satisfy this standard, as there was no manifestation of intent or assent by Appellants' upon which Holland & Hart could have possibly relied before filing the motion to intervene. In fact, Holland & Hart claims it relied only on the language of the Management

12

Agreement and TIC Agreement, which it reviewed only after the Receiver Action was filed against GERI. It was this misplaced reliance that led Holland & Hart to file the motion to intervene, not any manifestation of consent by Appellants.

### C. Holland & Hart Failed to Represent Appellants' Interests.

Finally, there should be no doubt that a conflict of interest existed in Holland & Hart's joint representation of Appellants alongside GERI. The Receiver sued GERI based upon its conduct in knowingly acquiring the Property from entities connected to Southwick and the Vescor Ponzi Scheme and for breaching the Amended Holdback Agreement. Appellants were never parties to the PSA or the Amended Holdback Agreement, which explains why they were not named as parties in the Receiver Action. Appellants acquired their TIC interests in the Property through or directly from GERI and its affiliates as bona fid purchasers for value. It was the misconduct of GERI and its affiliates that exposed the Property and the Holdback Funds to the Receiver's claims. As such, Appellants clearly had the right to assert claims against GERI for indemnity, which is exactly what the Minority TICs did once they discovered the true nature of the Receiver's claims.

## VI. STANDARD OF REVIEW

The standard of review on appeal of a district court's order granting a motion for summary judgment is well settled. Such orders are reviewed de novo,

utilizing the same standard applied by the district court in ruling upon the motion. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). In evaluating a summary judgment motion, a court must view all facts and draw all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

## VII. ARGUMENTS

### A. The District Court Erred in Determining that Appellants' Claims against Wachovia Are Barred by the Statute of Limitations.

Despite credible evidence that GERI actively concealed and misrepresented the nature of the Receiver's claims in its communications with Appellants for over three years after first receiving notice of the Receiver's claims in June 2008, the district court erroneously determined that Appellants' claims against Wachovia accrued no later than November 19, 2008 when GERI first sent Appellants an incomplete and misleading description of the Receiver's claims. 3 EOR 450. This one-paragraph description of the Receiver's claims that was sent to Appellants on November 19, 2008 was clearly insufficient to put Appellants on notice of facts supporting the necessary elements of their claims against Wachovia. As such, the District Court erred in granting Wachovia's motion for summary judgment.

1. **Determining When a Duty to Investigate Arises Is a Question of Fact that Is Rarely Appropriate for Resolution as a Matter of Law.**

Under Nevada law, the three-year statute of limitations that applies to claims based on fraud does not begin to run "until the plaintiff with due diligence knows to a reasonable probability of injury, its nature, its cause, and the identity of the allegedly responsible defendant." *Siragusa v. Brown*, 114 Nev. 1384, 1391, 971 P.2d 801, 806 (1998). Summary disposition of such a claim based upon the date of accrual is only appropriate where uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the facts giving rise to the cause of action. *See, e.g., Sierra Diesel Injection Serv. v. Burroughs Corp.*, 651 F.Supp. 1371, 1373 (D. Nev. 1987).

2. **The November 19, 2008 Quarterly Report Did Not Place Appellants on Inquiry Notice of Potential Claims against Wachovia.**

The district court relied very heavily upon the November 19, 2008 GERI report to determine, as a matter of law, that Appellants were placed on inquiry notice of potential claims against Wachovia no later than the date of that report. However, viewed in the light most favorable to Appellants, the actual language of the report did not provide sufficient information for any reasonable person to conclude that any fraud had occurred or even that any injury had been suffered. To

the contrary, the November 19, 2008 report affirmatively disclaimed any connection between the Holdback Funds and Southwick's securities fraud conviction. 3 EOR 450. Moreover, GERI repeatedly mischaracterized the claims asserted by the Receiver as a mere "temporary" issue and expressed confidence that the matter would be resolved as soon as the Receiver completed his review of the PSA and the Holdback Agreement. Remarkably, GERI's report failed to make any mention of the Receiver's June 9, 2008 letter to GERI in which the Receiver stated that he had already reviewed the PSA and the Holdback Agreement and had concluded that the Holdback Funds were part of the receivership estate. 4 EOR 756-758.

In subsequent quarterly reports to Appellants dated March 5, 2009 and June 2, 2009, GERI included nearly identical language describing the Receiver's claims as a "temporary" issue and again expressed its optimism that the matter would be resolved in Appellants' favor. 3 EOR 454, 457. The clear message Appellants took from GERI's reports was that the Receiver's claims amounted to nothing more than a nuisance and that the situation was being effectively managed. 3 EOR 528-530. Moreover, GERI consistently confirmed this message in quarterly conference calls with Appellants in which GERI downplayed the significance of the Receiver's claims. 3 EOR 528-530.

After the filing of the Receiver Action on July 9, 2009, GERI's misrepresentation of events became even more egregious. In another report to Appellants dated August 25, 2009, GERI strongly implied that the Receiver had filed suit against Appellants when, in fact, the Receiver had only named GERI in his complaint. GERI also failed to disclose that it was about to stipulate with the Receiver to add Appellants to the Receiver Action as defendants. Even after Appellants were made parties to the Receiver Action, GERI still did not provide copies of any pleadings or offer any honest assessment of the case to Appellants. 3 EOR 528-530.

As a result of GERI's obfuscations and outright misrepresentations, Appellants did not discover the true nature of the Receiver's claims until early 2010 when the Minority TICs became dissatisfied with GERI's superficial explanations and began their own investigation. 3 EOR 517-534. Once GERI's files were released in late 2011, Appellants finally had access to documents proving that GERI and its affiliates were fully aware of the Property's connection to Southwick and had knowledge of multiple undisclosed lawsuits filed against Southwick and his affiliates arising out of the Vescor Ponzi Scheme.

Importantly, GERI's files also contained email records showing that Wachovia knew of the claims asserted against Southwick and of the high

likelihood that the Property would be exposed to future litigation. Among other things, these emails showed that Wachovia approved the Amended Holdback Agreement that earmarked $300,000 to pay future legal costs and that Wachovia had discussed the reasons for setting aside funds to pay future legal costs with Triple Net Properties before the acquisition of the Property. 5 EOR 1112-1114. For the first time, Appellants also received a copy of the PSA, which included a list of specific lawsuits in which claims had been asserted against the Property. 3 EOR 370. It was only after receiving GERI's files on the Siena Investment in late 2011 that Appellants were finally put on notice that they held claims against Wachovia.

### 3. The Statute of Limitations on Appellants Claims against Wachovia Did Not Begin to Run Until Appellants Had Reason to Suspect Wachovia Was Culpable.

The Nevada Supreme Court has unambiguously held that a statute of limitations on claims based in fraud does not begin to run until the victim knows, or in the exercise of proper diligence should know, of facts constituting the elements of the fraud, including the identity of the culpable party. *Siragusa*, 114 Nev. at 1391, 971 P.2d at 806. "[T]he identity of the tortfeasor is a critical element of an enforceable claim: … 'The state should not commence to run until the plaintiff with due diligence knows to a reasonable probability of injury, its nature, its cause, *and the identity of the allegedly responsible defendant*.'" *Id*. at 1393,

807 (emphasis in original) (quoting *Spitler v. Dean*, 148 Wis.2d 630, 436 N.W.2d 308, 310 (Wis. 1989) (internal quotations omitted)).  The Nevada Supreme Court's holding in *Siragusa* is directly applicable to the matter at hand.

Accordingly, even if Appellants had reason to suspect that had been the victims of a fraud perpetrated by GERI and its affiliates at an earlier point in time, the three-year statute of limitations on their claims for fraud against Wachovia did not begin to run until Appellants finally gained access to GERI's files on the Siena Investment in late 2011.  The filing of Appellants' complaint against Wachovia less than a year later on July 20, 2012 was well within the both the three-year statutory period applicable to Appellants' claim for aiding and abetting fraud and the two-year statutory period applicable to Appellants' claim for aiding and abetting securities fraud.

### 4. GERI's Attempts to Conceal of the Nature of the Receiver's Claims Tolled the Running of the Statute of Limitations.

Notwithstanding the requirement expressed in *Siragusa* that a victim of fraud must know the identity of the culpable parties for the statute of limitations to begin to run, such victims "may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars within their reach."  *Id*. at 1394, 807.  They must exercise reasonable diligence to discover the facts supporting the elements of the fraud.  *Id*.  The

question of whether a victim has exercised reasonably diligence is a question of fact. *Id.* However, "[i]f a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, the equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs." *City of North Las Vegas v. The State of Nevada Local Gov't Emp. Mgmt. Relations Bd.*, 261 P.3d 1071, 1077 (Nev. 2011) (citing *Lukovsky v. City and County of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008) (quotation omitted)).

The factors that are typically considered by courts in determining whether equitable tolling will apply to delay the running of a statute of limitations are (i) whether the claimant has exercised reasonable diligence, (ii) the claimant's knowledge of relevant facts, and (iii) whether the claimant relied on misleading statements or conduct. *See generally*, *Siragusa*, 114 Nev. at 1394, 971 P.2d at 807-08; *City of North Las Vegas*, 261 P.3d at 1077; *Copeland v. Desert Inn Hotel*, 99 Nev. 823, 826, 673 P.2d 490, 492 (1983).

As discussed in detail above, GERI continually obscured, minimized, and misrepresented the significance of the Receiver's claims in its communications with Appellants. Appellants reasonably relied on GERI as their sole source of information regarding the Receiver's claims from November 2008 when GERI

20

first informed Appellants of the existence of the Receiver until early 2010 when the Minority TICs began to suspect that GERI was being less than forthcoming in its communications with Appellants. The misleading and incomplete information GERI provided in the November 19, 2008 and subsequent reports to Appellants was simply insufficient to place a reasonable person on notice that they had been defrauded in purchasing an interest in the Property.

Finally, the record clearly reflects that Appellants, through the Minority TICs, exercised reasonable diligence to discover the basis for the claims against Wachovia from the time they first began to doubt GERI's representations concerning the Receiver Action in early 2010 until they finally obtained access to GERI's files on the Siena Investment in late 2011. The Minority TICs retained separate legal counsel and, beginning in June 2010, demanded that Holland & Hart turn over information and documents to assist in the investigation of the basis for the Receiver's claims. These initial demands triggered a dispute over access to GERI's files on the Siena Investment that would take over a year to resolve at great expense to Appellants as GERI continued to fund its legal fees out of the operating income of the Property. 3 EOR 517-534. Under these circumstances, the statute of limitations on Appellants' claims against Wachovia must be tolled until Appellants

were actually able to identify facts supporting their claims. To hold otherwise, would unfairly punish Appellants for GERI's wrongful conduct.

**B.     The District Court Erred in Finding that Holland & Hart Acted with Implied Actual Authority.**

The record does not support Holland & Hart's contention that it believed at the time it undertook to represent Appellants' interests that it was acting in accordance with Appellants' wishes. To the contrary, Holland & Hart knew or should have known at that time that GERI did not have authority to engage Holland & Hart to act on Appellants' behalf. Consequently, there is no basis to conclude Holland & Hart acted with implied actual authority.

**1. Actual Authority, Whether Express or Implied, Requires a Manifestation of Assent.**

Initially, it should be noted that Holland & Hart never argued in its moving papers that it held implied actual authority to act for Appellants. Rather, Holland & Hart argued that GERI was authorized under the Management Agreement and the TIC Agreement to engage Holland & Hart to act on Appellants' behalf. During oral argument at the August 28, 2014 hearing, it was the district court that reframed Holland & Hart's argument to suggest that Holland & Hart was claiming that implied actual authority existed. 1 EOR 107, 112.

Regardless of whether it claims to have acted with express or implied actual authority, Holland & Hart must demonstrate that it believed at the time it undertook to represent Appellants' interests that it reasonably believed based upon some manifestation by Appellants that it was acting in accordance with Appellants' wishes. *See* Restatement (Third) of Agency, § 2.01 (2006) ("An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent believes in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."). Based on the record before the Court, Holland & Hart cannot satisfy this standard.

Holland & Hart was engaged by GERI in connection with the Receiver's claims on June 23, 2008. 4 EOR 867-873. Yet, Mona Burton, the Holland & Hart partner responsible for handling the matter, testified during her deposition as a Fed. R. Civ. P. 30(b) designee of Holland & Hart that she had no communication of any kind with any Appellant until after the filing of the Receiver's Action over a year later on July 6, 2009. 4 EOR 766-767. In fact, Burton testified that she was unaware that Appellants held any interest in the Property until after the filing of the Receiver's Action. 4 EOR 767-768. Without having communicated with Appellants or having any knowledge of Appellants existence, Holland & Hart cannot possibly maintain that it relied upon any manifestation by Appellants at the

23

time it was first engaged by GERI in 2008. *See* Restatement (Third) of Agency, §
1.03 (2006) ("A person manifests assent or intention through written or spoken
words or other conduct.").

On August 27, 2009, Holland & Hart entered into a second written
engagement letter with GERI under which the scope of its representation was
purportedly expanded to include Appellants' interests in the Receiver Action. 4
EOR 867-879. However, even after learning that Appellants were the actual
owners of the Property, Burton testified that Holland & Hart had no
communication with any Appellant until after filing a motion to intervene on
Appellants behalf. 4 EOR 782. Consequently, it is again impossible for Holland
& Hart to maintain that it relied upon any manifestation by Appellants at the time it
explicitly agreed to represent their interests in the Receiver Action or when it later
filed a motion to intervene without Appellants' knowledge on October 5, 2009.
There had never been any interaction with Appellants upon which Holland & Hart
could have relied to form a reasonable belief that it was acting in accordance with
Appellants' wishes at that time.

### 2. GERI Had No Actual Authority to Engage Holland & Hart to Act for Appellants.

In fact, Holland & Hart has never claimed that it relied upon any
manifestation by Appellants in undertaking to represent their interests. Rather,

Burton testified in her deposition that Holland & Hart examined the TIC Agreement and the Management Agreement and concluded that GERI had authority to engage Holland & Hart to act for Appellants in the Receiver Action. 4 EOR 769-773.

However, the district court correctly agreed with Appellants that neither the TIC Agreement nor the Management Agreement supports Holland & Hart's arguments. Likewise, the Management Agreement strictly limits GERI's ability to act on Appellants' behalf to matters relating to the "Operation, Maintenance, and Repair of the Property." Similarly, section 7.2 of the Management Agreement, upon which Holland & Hart relied in its motion, restricts GERI's ability to use operating funds from the Property to pay only "expenses of the operation, maintenance, and repair of the Property" as "contemplated by the Budget."

The Receiver's claims against GERI were based entirely upon the acquisition of the Property by GERI's predecessor, Triple Net Properties. Because the Receiver's claims against GERI did not arise from "the operation, maintenance, [or] repair of the Property," GERI had no actual authority under the Management Agreement to engage Holland & Hart on Appellants' behalf or to pay Holland & Hart's fees using funds that rightfully belonged to Appellants as the owners of the Property.

### 3. Holland & Hart Cannot Rely on Communications with GERI to Establish that It Acted with Actual Authority.

Holland & Hart could not have reasonably relied upon its communications with GERI to justify its actions in undertaking to represent Appellants' interest. *See* Restatement (Third) of Agency, § 3.15(2) ("An agent may appoint a subagent only if the agent has actual or apparent authority to do so."). Having reviewed both the TIC Agreement and the Management Agreement, Holland & Hart either knew or should have known the GERI held no actual authority to engage Holland & Hart on Appellants' behalf.

Similarly, there was no legitimate basis for Holland & Hart to believe at the time it was engaged that GERI held any apparent authority to act for Appellants in such matters. *See id*, § 3.03 ("Apparent authority, as defined in § 2.03, is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation."). Because it had never communicated with Appellants prior to undertaking their representation, Holland & Hart cannot establish that it relied upon any manifestation by Appellants to form a reasonable belief that GERI was authorized to act on Appellants' behalf in connection with the Receiver Action.

Holland & Hart simply was not privy to anything said or done by Appellants in the matter.

**4. Appellants Did Not Ratify Holland & Hart's Unauthorized Actions.**

Holland & Hart cannot establish that Appellants ratified its unauthorized actions through their failure to object. First, it is undisputed that the Minority TICs actually did object to Holland & Hart's actions when they became aware of the true nature of their involvement in the Receiver Action in early 2010. Second, to the extent other Appellants did not object, their silence did not constitute ratification of Holland & Hart's actions. There can be no ratification without knowledge of material facts. *See id*, §§ 4.01, 4.06 ("A person is not bound by a ratification made without knowledge of material facts involved in the original act when the person was unaware of such lack of knowledge."). Holland & Hart provided absolutely no written information to Appellants concerning its actions. What little information Appellants received came almost exclusively from GERI and was unquestionably incomplete and misleading. Moreover, even if some Appellants acquiesced to Holland & Hart's handling of the Receiver Action in order to avoid incurring additional losses, that acquiescence would not release Holland & Hart from liability to Appellants for its authorized conduct. *See id*., §

4.02 ("Ratification is not effective … in favor of an agent against a principal when the principal ratifies to avoid a loss.").

**C.    Holland & Hart Failed to Faithfully Represent Appellants' Interests.**

"As fiduciaries, attorneys have a legal duty to represent the client with undivided loyalty, to preserve the client's confidences, and to disclose any material matters bearing upon the representation of the client." *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1290 (Ut. Ct. App. 1996) (quotation omitted).  Holland & Hart failed to fulfill this duty to Appellants.  It failed to disclose several significant matters to Appellants, including the basis for the Receiver's claims against GERI, the filing of the motion to intervene to make Appellants' parties to the Receiver Action, GERI's knowledge of the Property's connection to the Vescor Ponzi Scheme at the time of purchase, and Appellants' rights to seek indemnity from GERI for the costs of their defense and any liability actually owed to the Receiver.  Instead, Holland & Hart stood silent while GERI mislead Appellants as to the nature of the Receiver's claims, concealed its own liability to Appellants, made Appellants the targets of the Receiver's claims, and used Appellants' funds to pay for its own defense.

There is no basis in the record to support the district court's conclusion that no conflict of interest existed because Appellants' and GERI interests were

aligned. Separate and apart from any claim based upon ownership of the Property or the Holdback Funds, the Receiver asserted separate claims for damages against GERI based upon its alleged breach the Amended and Restated Escrow Agreement. Furthermore, nothing in either the June 23, 2008 or August 27, 2009 engagement letters limits the scope of Holland & Hart's representation of Appellants to matters in which their interests aligned with the interest of GERI. Appellants clearly had the right to assert claims against GERI for indemnity, which is exactly what the Minority TICs did once they discovered the true nature of the Receiver's claims and retained independent legal counsel that was not beholden to GERI.

Holland & Hart undertook to represent Appellants' interests in the Receiver Action without any reasonable basis to conclude that they had actual authority to do so. This error in judgment created a conflict of interest that precluded Holland & Hart from fully representing Appellants' interests because doing so would have required that Holland & Hart take actions adverse to GERI's interests. Even after the Minority TICs engaged independent legal counsel and complained of this conflict of interest, Holland & Hart continued to represent the majority of Appellants alongside GERI and to accept payment for its services from Property operating funds that belonged to Appellants, not GERI. Among other harms, this

conflict of interest erupted into a protracted and expensive battle over access to GERI's files on the Siena Investment that had been provided to Holland & Hart for use in Appellants' defense. This dispute exhausted Appellants' resources and left Appellants at a significant disadvantage in their efforts to defend against the Receiver's claims.

> In all relationships with clients, attorneys are required to exercise impeccable honesty, fair dealing, and fidelity. The Utah Supreme Court has articulated the standard to which attorneys must be held as follows: Where an attorney is hired solely to represent the interest of a client, his fiduciary duty is of the highest order and he must not represent interests adverse to those of the client. … He is not permitted to take advantage of his position or superior knowledge to impose upon the client; nor to conceal facts or law, nor in any way deceive him without being held responsible therefore.

*Id*. at 1290 (quoting *Smoot v. Lund*, 13 Utah 2d 168, 172, 369 P.2d 933, 936 (1962)). Whether intention or inadvertent, Holland & Hart plainly failed to fulfill its obligations as Appellants' attorneys. As a result, Appellants suffered considerable harm for which Holland & Hart must be held accountable.

## VIII. CONCLUSION

The district court's decisions granting Wachovia and Holland & Hart's respective motions for summary judgment were erroneous. Appellants respectfully request that this Court overrule the district court's decisions and remand this action back to the district court for trial.

Dated March 3, 2015.

**KOLESAR & LEATHAM**

*/s/ Bart K. Larsen, Esq.*
Bart K. Larsen
Nevada Bar No. 008538
400 South Rampart Blvd., Suite 400
Las Vegas, NV  89145

*Attorneys for Appellants*

## CORPORATE DISCLOSURE STATEMENT

The undersigned, counsel for Appellants, certifies that the Appellants are each a non governmental corporate party and that:

None of the Appellants has a parent corporation, nor is there any publicly held corporation that owns 10% or more of any of Appellants stock.

Dated March 3, 2015.

KOLESAR & LEATHAM

/s/ Bart K. Larsen, Esq.
Bart K. Larsen
Nevada Bar No. 008538
400 South Rampart Blvd., Suite 400
Las Vegas, NV  89145

*Attorneys for Appellants*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6 of the Rules of the United States Court of Appeals for the Ninth Circuit, Appellants state that they are unaware of any related cases.

Dated March 3, 2015.

KOLESAR & LEATHAM

*/s/ Bart K. Larsen, Esq.*
Bart K. Larsen
Nevada Bar No. 008538
400 South Rampart Blvd., Suite 400
Las Vegas, NV 89145

*Attorneys for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2015, I allowed the court's ECF system to serve a copy of Appellants' Opening Brief on the following interested parties:

Jeffrey Willis, Esq.
Kelly H. Dove, Esq.
Nevada Bar No. 4797
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169

*Attorneys for Wells Fargo Bank, N.A., successor by merger with Wachovia Bank, N.A.*

Steve Morris, Esq.
Ryan Lower, Esq.
Morris Law Group
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101

*Attorneys for Holland & Hart, L.L.P.*

Dated March 3, 2015.

KOLESAR & LEATHAM

*/s/ Bart K. Larsen, Esq.*
Bart K. Larsen
Nevada Bar No. 008538
400 South Rampart Blvd., Suite 400
Las Vegas, NV 89145

*Attorneys for Appellants*

**Form 6.    Certificate of Compliance With Type-Volume Limitation,
          Typeface Requirements, and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   ☒ this brief contains ___7,096___ words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   ☐ this brief uses a monospaced typeface and contains_____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this brief has been prepared in a proportionally spaced typeface using *(state name and version of word processing program)* MS Word 2010 _____
   *(state font size and name of type style)* 14 point Times New Roman _____, *or*

   ☐ this brief has been prepared in a monospaced spaced typeface using *(state name and version of word processing program)* _____
   with *(state number of characters per inch and name of type style)*

   _____ .

   Signature | /s/ Bart K. Larsen, Esq. |

   Attorney for | Appellants |

   Date | March 3, 2015 |